| | |
|---|---|
| JOAN RAVENNA, <br><br> Plaintiff, <br><br> v. <br><br> VILLAGE OF SKOKIE and OFFICER J.R. VEENHUIS, <br><br> Defendants. | No. 17 C 5685 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Joan Ravenna alleges that the Village of Skokie violated the federal Americans with Disabilities Act and Rehabilitation Act in their decision to, and in the manner in which, it arrested her. The parties have cross moved for summary judgment. R. 101; R. 102; R. 105. Those motions are denied.[1]

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most

---

[1] Ravenna also claims that defendant Officer Veenhuis used excessive force in arresting her. That claim is not at issue in these motions. While the parties discuss in their briefs whether Officer Veenhuis's actions violated the ADA, for the reasons discussed in this opinion, Officer Veenhuis is not subject to liability under Title II of the ADA.

favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

As early as August 2014, Ravenna began to call the Skokie police department to complain that her next-door neighbor had broken into her house. R. 118 ¶ 1. The record reflects that Skokie police either responded to calls from Ravenna or had conversations with her at her home on at least 41 separate days (on some days more than once) through August 1, 2015. *See* R. 118. The frequency of these interactions increased, with 23 occurring between June 1 and August 1, 2015. *See id.*

The police never found any evidence to support Ravenna's allegations against her neighbor. Rather, the police reports note that Ravenna's claims were "delusional," *see, e.g., id.* ¶ 8, frequently involving Ravenna claiming either that her dog "told" her that the neighbor was entering the house, or that the dog had opened the door for the neighbor. For instance, in a report of a visit with Ravenna on May 28, 2015, the responding officer reported:

> Ravenna then continued to explain how her dog (Leyla) has conversations with [the neighbor] and that Leyla gives items such as clothing, jewelry, and food to him. Ravenna stated Leyla knows how to unlock the dead bolt lock on the

2

door and turn the door knob to let [the neighbor] in when Ravenna is not in the residence.

R. 118 at 5.

At her deposition Ravenna denied making many of the statements recorded by Skokie police. But she stood by her report of May 25, 2015, *see* R. 118 at 10, that her neighbor had anally raped her dog:

> Q. Did you ever see [the neighbor] rape your dog?
> A. I saw him run out of the house the day of the rape. It was Mother's Day that year, May—the third Sunday in May, I think.
> Q. Of 2015?
> A. Yes.
> Q. You saw him run out of the house?
> A. He ran out the back while I pulled in the driveway.
> Q. So you never saw him rape your dog?
> A. No. I came in and she wouldn't walk.
> Q. Who is she?
> A. My dog.
> Q. What is your dog's name?
> A. Leila.
> Q. Do you still own Leila?
> A. Yes.
> Q. And she wouldn't walk.
> A. She didn't want—she wouldn't get up to eat which was highly unusual and I asked her—we have some communication. She's responsive to me. If I ask her a question and it's a yes answer, she'll wag her tail. And I asked he if she was hurted [sic], and she said yes. She indicated yes, and I said okay I'm going to pretend to be a doctor and I'm going to poke around and see what's bothering you. I don't—there must be a reason you're not moving. And I got to her tail and I lifted it up and—she's very furry. She's a border collie mix, and her entire back end was covered with blood.
> Q. Did you—did you ask your dog whether she had been raped?
> A. I said who hurt you, do you know. I said do you know who hurt you. She nodded and wagged her tail, and she pointed to [the neighbor's] house with her paw.

3

> Q. And did you ask your dog if [the neighbor] had raped her?
> A. If he hurt her. She doesn't know what rape means.
> Q. Okay. And her response she wagged her tail? [sic]
> A. Yes. And she nodded which she does sometimes.

R. 105-1 at 13-14 (52:15–54:7). The corresponding police report described the incident as follows:

> [Ravenna] believes that her neighbor . . . is stealthily breaking into her home at all [hours] and raping her dog, Layla. Ravenna told SPD dispatch that the dog was kidnapped, but Layla was present and appeared normal. Ravenna stated that the dog is constantly and repeatedly anally raped and sodomized by the neighbor, and that there is blood everywhere. When I asked to see the blood, Ravenna claimed that the neighbor cleaned it up just prior to SPD arrival and that [the neighbor] is very sneaky. She also told me that part of Layla's tail was removed for "easier access." The tail appeared normal.

R. 118 at 10.

The police reports contain many notations that officers believe Ravenna was suffering from mental illness and required medical attention. *See* R. 116 at 11-12 (citing records). Several reporting officers requested that their reports be forwarded to a social worker employed by the police department. *See*, *e.g.*, R. 103 at 22, 26, 28, 30. On May 22, 2015, the Skokie Police Chief and the social worker visited Ravenna. They told her that her neighbor was not breaking into her house and unsuccessfully tried to convince her to go to the emergency room. R. 118 at 18.

On August 2, 2015, matters came to a head when Ravenna's neighbor called the police because Ravenna was banging on his windows and doors and standing in his yard telling him to return sunglasses she believed he had stolen. R. 118 at 18.

4

After responding to the neighbor's call and watching a video recording of Ravenna's actions, defendant Officer Veenhuis concluded that there was probable cause to arrest Ravenna for disorderly conduct. *Id.* The neighbor told Officer Veenhuis that he would be willing to sign a complaint against Ravenna. *Id.* Officer Veenhuis did not arrest Ravenna because she was not home at the time. *Id.* Officer Veenhuis had been the responding officer for Ravenna's call on June 11, 2015, which was one of the instances when she claimed her neighbor had entered her house and raped her dog, and that the dog had "told" Ravenna about this. *See* R. 103 at 58.

About four days later on August 6, Ravenna called the police at 1:07 a.m. and again at 1:34 a.m. to report that her neighbor had been in her house earlier in the day and had stolen her medicine. R. 118 at 19. Officer Veehuis, another officer, a sergeant, and Commander Robert Libit arrived at Ravenna's house at 2:30 a.m. *Id.* The officers knew that the neighbor had made a complaint against Ravenna on August 2, and that Officer Veenhuis believed there was probable cause to arrest Ravenna. *Id.* In a subsequent report to the Police Chief, Commander Libit noted that this incident with Ravenna was "another unfounded complaint due to delusions," *see* R. 103 at 166, implying that the Skokie Police Department was well aware of Ravenna's prior history of claims and believed her claims to be a product of mental illness.

Upon arrival, Officer Veenhuis spoke with the neighbor who said he still wanted to sign a complaint against Raveena. R. 118 at 20. The officers asked Ravenna to come outside her house. *Id.* Ravenna eventually exited her house and the officers

5

sought to arrest her. *Id.* The facts regarding the arrest are disputed. The officers testified that Ravenna resisted arrest. *Id.* at 21. Ravenna testified that she did not resist and the officers "knocked [her] over." *Id.*

Ravenna was arrested even though Illinois law authorizes (but does not require) commencement of a misdemeanor prosecution with a "summons" or "notice to appear." R. 118 at 23 (¶ 23). But the Police Chief, who has been an officer for 37 years, testified that the Skokie Police Department only initiates misdemeanor prosecutions with arrests. *Id.* (¶ 24). Yet, a Skokie Police Department General Order instructs officers to "not threaten [a mentally ill] person with an arrest," but to "explain first that you need to talk to them further at the police station." *Id.* at 24-25 (¶¶ 27-28).

Ravenna was taken into custody at the Skokie police station. She appeared before a judge that afternoon (August 6), and was released later that day. *Id.* ¶ 22.

## Analysis

Ravenna claims that Skokie's conduct violated Title II of the Americans with Disabilities Act, which provides:

> no qualified individual with a disability shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The Act defines "public entity" to mean, in relevant part:

> (A) any State or local government; [or]
> (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . .

6

42 U.S.C. § 12131. Only "public entities," and not individuals, are proper defendants under this statute. *See City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1773 (2015) ("Only public entities are subject to Title II[.]"); *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000) ("Under Title II of the ADA . . . the proper defendant is that 'entity.' . . . [A]s a rule there is no personal liability under Title II[.]").

## I. Scope

Skokie first argues that the ADA does not "apply to arresting, booking, and/or holding suspects." R. 101 at 1. But the primary authority Skokie cites in support of this argument is the Fifth Circuit's holding that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, *prior to the officer's securing the scene and ensuring that there is no threat to human life.*" *Id.* at 2 (quoting *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) (emphasis added)). Skokie cannot argue that there was any danger or threat afoot when its officers arrested Ravenna. The Skokie Police Department has known for years that Ravenna's complaints were unfounded and likely the product of mental illness. And there is no evidence that Ravenna posed a threat to anyone at the time of her arrest. As the Fifth Circuit explained in *Hainze*, when addressing a situation that is "secure" and without "threat to human safety, [law enforcement officers are] under a duty to reasonably accommodate [an arrestee's] disability in handling and transporting him to a mental health facility." 207 F.3d at 802. Contrary to Skokie's argument, "no circuit has found Title II of the ADA wholly inapplicable to ad hoc police encounters," and some even

7

consider "exigent circumstances attendant to a police officer's decisions during an ad hoc encounter [to] simply weigh in the balance when evaluating the reasonableness of a prospective ADA accommodation." *Gray v. Cummings*, 917 F.3d 1, 16-17 (1st Cir. 2019) (citing cases); *see also Estate of Robey by Robey v. City of Chicago*, 2018 WL 688316, at *5 (N.D. Ill. Feb. 2, 2018) ("[W]here exigent circumstances were not present, courts have found that government entities can be held liable for failure to accommodate under the ADA in relation to on-the-street arrest situations."). Thus, Skokie's conduct in this case is subject to Title II of the ADA.

## II. Vicarious Liability

Skokie next argues that it cannot be vicariously liable for the conduct of its officers. Whether Title II permits vicariously liability is a question that has been identified but not addressed by the Supreme Court. *See Sheehan*, 135 S. Ct. at 1773-74 ("Our decision not to decide whether the ADA applies to arrests is reinforced by the parties' failure to address a related question: whether a public entity can be liable for damages under Title II for an arrest made by its police officers. Only public entities are subject to Title II, and the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees. But we have never decided whether that is correct, and we decline to do so here, in the absence of adversarial briefing."). The Seventh Circuit has not addressed this question. Other circuits are split. The Ninth Circuit has held that public entities can be vicariously liable for Title II violations. *See Duvall v. City of Kitsap*, 260 F.3d 1124 (9th Cir. 2001). By contrast, the Eleventh Circuit has held

8

that Section 504 of the Rehabilitation Act (a statute "functionally identical" to Title II of the ADA, *see P.F. by A.F. v. Taylor*, 914 F.3d 467, 471 (7th Cir. 2019)) does not permit vicarious liability. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334 (11th Cir. 2012).

The foundation of the Ninth Circuit's decision in *Duvall* is questionable. The *Duvall* decision simply cites a Ninth Circuit decision from 1988, which relies on the reasoning of a Southern District of New York case from 1980 addressing a claim for violation of Section 504. *See* 260 F.3d at 1141 (citing *Bonner v. Lewis*, 857 F.2d 559, 566 (9th Cir. 1988) (citing *Patton v. Dumpson*, 498 F. Supp. 933, 942 (S.D.N.Y. 1980))). The underlying decisions— *Bonner* and *Patton*—were primarily based on a combination of policy and statutory interpretation arguments that do not hold water. First, the courts reasoned that the primary remedy under Section 504 is injunctive relief directed at the public agency, "not the employee who actually perpetrated the violation," and thus the statute should be understood to "rel[y] heavily upon the idea of vicarious liability," even for damage claims. *See Bonner*, 857 F.2d at 566. But the observation that relief under Section 504 is primarily injunctive (which is also generally true under Title II of the ADA) is not necessarily a basis to imply vicarious liability. The fact that the statutes are focused on enforcing an agency's compliance could just as easily imply that the decisions of individual agency employees to grant or deny certain services for people with disabilities should be considered to have been ratified or adopted by the agency *itself* without the need for vicarious liability through the employee.

9

Relatedly, the *Bonner* and *Patton* courts reasoned that respondeat superior liability is consistent with the intent of Section 504 to eliminate discrimination, and that absent "a Congressional directive to the contrary," the courts would assume that "Congress intended the judiciary to use every available tool" to achieve that goal. *Bonner*, 857 F.2d at 566-67 (quoting *Patton*, 498 F. Supp. at 943). The courts' understanding of Congressional intent was informed by the courts' perception that "with the exception of § 1983, the general rule regarding actions under civil rights statutes is that respondeat superior applies." *Bonner*, 857 F.2d at 566 (citing *Patton*, 498 F. Supp. at 942-43). The courts cited Title VII, Title VIII of the Fair Housing Act, and Section 1981 as examples.[2] It is true that Title VII and Title VIII provide respondeat superior liability. The problem with analogizing from those statutes to Section 504, and by extension Title II of the ADA, is that neither Section 504 or Title II of the ADA provide for individual or personal liability. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) (Section 504). And contrary to the Ninth Circuit's reasoning, the Seventh Circuit has held when a statute fails to provide individual or personal liability, vicariously liability "based on agency principles" is *not* available. *See Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1022-28 (7th Cir. 1997). The Seventh Circuit explained that Title VII permits respondeat superior liability because it defines "employer" to include "agents of the

---

[2] One problem with the Ninth Circuit's reasoning is that the Seventh Circuit has held that Section 1981 is subject to *Monell* which bars respondeat superior liability. *See Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014) ("§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors").

10

employer," whereas Title IX (the statute at issue in *Smith*), which lacks analogous statutory language, does not permit such liability. *See id.* at 1025.[3] This reasoning implies that the lack language in Title II creating individual or personal liability for should mean that an agency cannot be liable for a Title II violation under a theory of respondeat superior liability.

Unlike the Ninth Circuit's decision in *Duvall*, the Eleventh Circuit's decision in *Liese* finding no respondeat superior liability under Title II of the ADA stands on much stronger ground. The Eleventh Circuit's decision tracks the Supreme Court's reasoning in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), a decision issued shortly after the Seventh Circuit's decision in *Smith*. *Smith* had created a circuit split regarding respondeat superior liability under Title IX, which *Gebser* resolved in *Smith's* favor. As in *Smith*, *Gebser* relied on the fact that Title IX is focused on violations by the agency and not the agency's employees. The Court explained that under Title IX an agency agrees to provide certain services in order to receive federal funding. The statute:

> presupposes that an official who is advised of a Title IX violation refuses to take action to bring the [agency] into compliance. The premise, in other words, is an official decision by the [agency] not to remedy the violation. . . .
>
> Consequently, in cases like this one that do not involve official policy of the [agency], we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the

---

[3] Like Title VII, Title VIII of the Fair Housing Act imposes liability on "persons," defined to include "individuals" and well as entities. *See* 42 U.S.C. §§ 3602(d), 3605.

11

> [agency's] behalf has actual knowledge of discrimination in the [agency's] programs and fails to adequately respond.

*Id.* at 290. The Ninth Circuit neglected to account for *Gebser* in *Duvall* when it held that Title II provides respondeat superior liability. By contrast in *Liese*, the Eleventh Circuit found *Gebser's* reasoning equally applicable to Section 504, and by extension Title II of the ADA. *See* 701 F.3d at 348 ("The two principal purposes of Title IX that were outlined in *Gebser*—to avoid the use of Federal funds to support discriminatory practices and to protect citizens against discriminatory practices—are shared by § 504 of the [Rehabilitation Act].").

The Ninth Circuit also found respondeat superior liability available under Title II because the "specific wording" and "legislative history" that led the Supreme Court to bar respondeat superior liability under Section 1983 in *Monell* are specific to that statute and "difficult to extend" to Title II. *See Bonner*, 857 F.2d at 566. It is true that Section 1983 expressly provides liability only for "persons" and that in *Monell* the Supreme Court held this particular language and its legislative history precluded respondeat superior liability. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-92 (1978). But in *Gebser*, the Supreme Court noted that the concern that motivated *Monell*, regarding the "risk that the [public entity] would be liable in damages not for its own official decision but instead for its employees' independent actions," was also present with respect to Title IX since the statute did *not* provide individual or personal liability. 524 U.S. at 290-91. This indicates that *Monell's* rejection of respondeat superior liability with respect to public entities

should extend to any civil rights statute that—like Title II of the ADA—provides liability for the entity while excluding liability for individuals.

Contrary to the foregoing analysis, some courts in this district have surmised that the Seventh Circuit would hold that respondeat superior liability is available under Title II of the ADA based on the Seventh Circuit's decision in *Reed v. Columbia St. Mary's Hospital*, 782 F.3d 331 (7th Cir. 2015).[4] *See Field v. Hous. Auth. of Cook Cty.*, 2018 WL 3831513, at *8 (N.D. Ill. Aug. 13, 2018) ("the facts in [*Reed*], which the Seventh Circuit ruled stated a viable claim for retaliation under the Rehabilitation Act, were based on vicarious liability of an employer for the retaliatory acts of its employees"); *Simmons v. Godinez*, 2018 WL 2391116, at *2 n.3 (N.D. Ill. May 25, 2018) (stating that *Reed* "interpreted the ADA and the Rehabilitation Act to provide for *respondeat superior* liability"); *Mapp v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 2016 WL 4479560, at *4 (N.D. Ill. Aug. 25, 2016) ("[*Reed*] recognized that a plaintiff had stated viable claims under ADA's Title II against a defendant hospital based on the conduct of its employees"); *Reed v. State of Illinois*, 2016 WL 2622312,

---

[4] These district court decisions also appear to have been influenced by the Seventh Circuit's holding that respondeat superior liability for covered "employers" is available in claims under Title I of the ADA governing disability discrimination in employment. *See Silk v. City of Chicago*, 194 F.3d 788, 805 (7th Cir. 1999). But Title I's definition of "employer" includes "any agent of such [employer]." 42 U.S.C. § 12111(5)(A). It is this definition that provides the basis for respondeat superior liability under Title I. *See U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1281 (7th Cir. 1995) ("the actual reason for the 'and any agent' language in the definition of 'employer' was to ensure that courts would impose respondeat superior liability upon employers for the acts of their agents"). Title II's definition of a covered "public entity" does not include an analogous reference to "agents of the public entity." The Court does not find Title I's definition and the Seventh Circuit decision addressing it persuasive here.

at *4 (N.D. Ill. May 9, 2016) ("While [*Reed*] does not expressly address vicarious liability under Title II or the Rehabilitation Act, its outcome constrains this Court in finding—as a matter of law at this juncture—that the State Defendants cannot be held liable for damages under a vicarious liability theory."); *Novak v. Hall*, 139 F. Supp. 3d 901, 909 (N.D. Ill. 2015) (same holding prior to *Reed*).[5]

A primary problem with these district court decisions is that *Reed* addressed Title III of the ADA governing discrimination by "public accommodations," not Title II which governs "public entities." (It appears that many of the district court decisions simply mistakenly overlooked this difference.) Unlike Title II's definition of "public entity" which is limited to the entity itself, Title III's prohibition of discrimination extends not simply to the "public accommodation" itself or its owner, but to "operators" of public accommodations. *See* 42 U.S.C. § 12182(a). Title III's broader liability counsels against finding *Reed's* holding relevant to Title II.

Moreover, "public accommodations" are by definition not "public entities." And the Supreme Court has been reluctant to extend vicariously liability to state and municipal entities absent explicit instruction from Congress. *See Monell*. This principle also limits the persuasiveness of *Reed* to this case.

Furthermore, the district court cases finding *Reed* relevant to Title II did not consider the Seventh Circuit's decision in *Smith*, nor the Supreme Court's decision in *Gebser*, in interpreting *Reed's* meaning. The plaintiff in *Reed* alleged:

---

[5] The Court is aware of only one other district court that has followed *Gebser* to hold that respondeat superior liability is not available under Title II. *See Jones v. City of Detroit*, 2019 WL 2355377, at *6 (E.D. Mich. June 4, 2019).

14

> On one occasion, when Reed asked that staff bring the computer to her, they refused to do so because of her disabilities. When she repeated her request, she alleges, the staff retaliated against her by grabbing her and throwing her into a "seclusion room." Later, staff summoned Reed to a meeting with a doctor to discuss her discharge, where, still without her computer, she was unable to communicate. When the hospital discharged Reed, she asked to call her case manager, but hospital staff refused Reed's request, again because of her disabilities. To retaliate further they allegedly had Reed escorted out of the hospital by security guards, who injured her in the process.

*Reed*, 782 F.3d at 334-35. The Seventh Circuit held that these allegations stated a claim for violation of Title II by the hospital. The Seventh Circuit did not address the theory of liability underlying the claim. The district courts cited above assumed that the claim must be based on respondeat superior liability for the actions of the hospital's staff. But this assumption ignores plausible inferences that can be drawn from the plaintiff's allegations. The plaintiff in *Reed* alleged that a "doctor" and not merely "staff" were involved in her injuries. She also alleged that staff mistreated her over a period of time. These two allegations permit the plausible inference that a hospital officer with the authority "to institute corrective measures" on the hospital's behalf "had actual knowledge" of the staff's actions. *See Gebser*, 524 U.S. at 290. If these inferences are true, it would support direct liability for the hospital in accordance with *Gebser* and *Smith*, without the need for respondeat superior liability. Since this interpretation of *Reed* comports with *Gebser* and *Smith*, this Court declines to follow prior district court cases finding that *Reed* stands for the proposition that Title II of the ADA permits respondeat superior liability.

15

For these reasons, the Court holds that in order to succeed on her Title II claim Ravenna must prove, in accordance with *Gebser*, that a Skokie "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on [Skokie's] behalf ha[d] actual knowledge of discrimination in [Skokie's] programs and fail[ed] to adequately respond." 524 U.S. at 290.

## III. Liability

Skokie argues that Ravenna's claim must be dismissed because it is premised on personal liability of Officer Veenhuis. But there is sufficient evidence for a reasonable jury to find direct liability for Skokie based on the standard set forth in *Gebser* discussed above. There is evidence that due to its extensive experience with Ravenna's repeated complaints, the Skokie Police Department considered Ravenna to have a mental illness. (Title II protects people who are "regarded has having [an] impairment," 42 U.S.C. § 12132(1)(C).)[6] Indeed, the Skokie Police Chief visited Ravenna with a social worker in an attempt to convince Ravenna to seek medical attention. With respect to the incident itself, a reasonable jury could find either or both that (1) Skokie decision-makers had the opportunity to advise the responding officers to take Ravenna's mental illness into consideration in addressing the situation, or (2) that the Commander on the scene was an individual with such authority. The Commander reported directly to the Police Chief noting that the incident was "another" product of Ravenna's "delusions." Officer Veenhuis's liability

---

[6] The Court does not need to address the relevance of Ravenna's claim of suffering from fibromyalgia to decide these motions.

16

or lack thereof (because of qualified immunity or otherwise) is irrelevant to this analysis.

There is also sufficient evidence in the record for a reasonable jury to find that Ravenna has established the substantive elements of her claim. "To establish a violation of Title II of the ADA, the plaintiff must prove [1] that he is a 'qualified individual with a disability,' [2] that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and [3] that the denial or discrimination was 'by reason of' his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). To show that she was discriminated against or denied benefits or services because of her disability, Ravenna must present "evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006). "Intentional" action by the defendant includes "deliberate indifference." *See Lacy v. Cook County*, 897 F.3d 847, 863 (7th Cir. 2018). For purposes of Title II, deliberate indifference means, "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* In applying these Title II standards to arrests:

> Courts have identified two general theories describing ways in which a police officer may violate the ADA in executing an arrest. The first such theory (which we shall call the "effects" theory) holds that a violation may be found when police wrongly arrested someone with a disability because they misperceived the effects of that disability as

> criminal activity. The second such theory (which we shall call the "accommodation" theory) holds that a violation may be found when police officers properly investigated and arrested a person with a disability for a crime unrelated to that disability, [but] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

*Gray*, 917 F.3d at 15 (internal citations and quotations omitted).

A reasonable jury could find liability for Skokie under both theories. There is evidence that Skokie understood Ravenna's actions to be the product of mental illness, not criminal activity. Thus, a jury could find for Ravenna on the "effects" theory.

Additionally, a reasonable jury could find that Skokie's policy requiring arrests for misdemeanor offenses, as applied to the misdemeanor disorderly conduct complaint against Ravenna, exhibits deliberate indifference to Ravenna's disability. This case likely would have been avoided if Skokie had issued a summons rather than subjecting her to the alleged violence and indignity of arrest. For this reason, a jury could find for Ravenna on the "accommodation" theory.

Ravenna argues that the evidence is sufficient to grant her summary judgment. While the Court agrees that there is strong evidence that Skokie considered Ravenna to be mentally ill and that the responding officers were aware of this information, these remain questions of fact for the jury. And while it is undisputed that Skokie policy require arrests even for misdemeanor complaints, the actual application of that policy remains to be determined. Furthermore, the answering the questions of whether Skokie "misperceived the effects of [Ravenna's]

disability as criminal activity" or "failed to reasonably accommodate [Ravenna's] disability" are requires fact intensive analyses not amenable to judgment as a matter of law. At bottom, these questions seek a determination of whether Skokie acted reasonably to arrest Ravenna considering all the circumstances. Ravenna has provided no authority that Skokie's actions were unreasonable as a matter of law. Those questions are for trial.

## Conclusion

Therefore, the parties' cross motions for summary judgment, R. 101; R. 102; R. 105, are denied.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: June 7, 2019